## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

v.

Darnell Andre Dunn (1), and
Justin Marlo Lindsey (2),

               Defendants.

Crim. No. 19-268 (MJD/BRT)

**REPORT AND
RECOMMENDATION**

Harry Jacobs, Esq., Assistant United States Attorney, counsel for Plaintiff.

Kurt B. Glaser, Esq., Smith & Glaser, LLC, counsel for Defendant Dunn.

Piper Kenney Wold, Esq., Law Office of Piper L. Kenney, counsel for Defendant Lindsey.

BECKY R. THORSON, United States Magistrate Judge.

## INTRODUCTION

On October 15, 2019, Defendant Darnell Andre Dunn was indicted on one count of felon in possession of a firearm – armed career criminal – in violation of 18 U.S.C. §§ 922(g)(1) and 924 (e)(1), and Defendant Justin Marlo Lindsey was indicted on one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1). (Doc. No. 1.) This matter is before the Court on Defendant Dunn's Motion for Suppression of Evidence (Doc. No. 55), specifically seeking suppression of evidence resulting from two traffic stops – one that occurred on August 30, 2019, in St. Paul, Minnesota, in the

vicinity of a reported crime, and another that occurred on August 31, 2019, in St. Paul, Minnesota, at a BP gas station. Defendant Lindsey's Motion to Suppress Search and Seizure Evidence (Doc. No. 56), also seeks suppression of evidence resulting from the August 31, 2019 stop.

This Court held a hearing on the motions on January 3, 2020, where the Government presented witness testimony from Officer Dustin Sweeney and seven hearing exhibits were received. (Doc. Nos. 60, 61.) The Court allowed post-hearing briefing on these motions and received Defendants briefs on January 25 and 27, 2020, and the Government's responsive brief on February 3, 2020. (Doc. Nos. 70, 71, 74.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons set forth below, this Court recommends that Defendant Dunn's Motion for Suppression of Evidence (Doc. No. 55) be granted in part and denied in part, and that Defendant Lindsey's Motion to Suppress Search and Seizure Evidence (Doc. No. 56) be denied.

## DISCUSSION

### I.    August 30, 2019 Traffic Stop

#### a.    Background[1]

Officer Sweeney has worked for the past two years for the St. Paul Police Department as a patrol officer.[2] (Tr. 9.) On August 30, 2019, sometime between 2:00–3:00 a.m., he heard a shots-fired call on the radio. (Tr. 13–14.) The dispatcher stated that several shots had been fired in the area of [XXX] Dayton Avenue and that a dark-colored SUV had been seen leaving the area southbound on Milton Avenue. (Tr. 14–15.) Officer Sweeney responded from his location on Hamline Avenue, turning eastbound on Marshall Avenue. (Tr. 15.) While driving eastbound on Marshall Avenue, Officer Sweeney testified that he saw a dark-colored SUV drive past him northbound on Griggs Avenue without any headlights on. (Tr. 15.) This was approximately six blocks from [XXX] Dayton Avenue, a distance that would take a little over a minute to drive if following speed limits. (Tr. 16.) Officer Sweeney stated that he executed a U-turn, the SUV turned westbound on Marshall Avenue, and the driver of the SUV then activated its

---

[1]    Officer Dustin Sweeney from the St. Paul Police Department testified at the January 3, 2020 hearing. The following background summary is taken from Officer Dustin Sweeney's testimony as well as from both the squad car video and the body-worn camera video from August 30, 2019. (*See generally* Doc. No. 69, Redacted Transcript ("Tr."); *see also* Doc. No. 61, Hr'g Exs. 1, 2.)

[2]    Prior to that, Officer Sweeney worked as a correctional officer for two years in Washington County, Minnesota, and before that he was a military police officer for the United States Air Force for approximately ten years. (Tr. 9.)

headlights.[3] (Tr. 15, 17, 20.) Officer Sweeney followed the SUV as it turned northbound onto Hamline Avenue, and then onto St. Anthony Avenue, which is a frontage road that leads to westbound 94. (Tr. 17.) At that point, Officer Sweeney activated the lights on his squad car[4] and notified dispatch that he was executing a traffic stop on the vehicle. (Tr. 17.) The SUV came to a stop and a second squad car pulled up alongside Officer Sweeney's squad car. (Tr. 20.) Officer Sweeney approached the passenger side of the vehicle while another officer approached the driver side.[5] (Tr. 21.) Officer Sweeney asked the passenger for his name and date of birth, to which he responded that his name was Andre Jones England, date of birth February 5, 1991.[6] (Tr. 21, 25.) Officer Sweeney described the behavior of the occupants of the SUV as nervous and fidgety. (Tr. 26–27.) At that point, the officers received information from dispatch that the suspect vehicle from the shots-fired call had out-of-state license plates. (Tr. 22.) Because the SUV that

---

[3]     Officer Sweeney also testified that the SUV appeared to be speeding. (Tr. 47.)

[4]     Officer Sweeney testified that squad car video consistently records in 30-second blocks of time. (Tr. 18.) When lights and sirens are activated on the squad car, the recording system will automatically preserve the previous 30 seconds of recording, without audio, and will continue to record from that point in time, with audio. (Tr. 18.)

[5]     During this interaction, Officer Sweeney mentioned that he saw the SUV "blacked out" on Marshall. The driver responded to that comment saying, "they're automatic lights." (Tr. 50.)

[6]     At the hearing, Officer Sweeney identified Defendant Dunn as the passenger of the vehicle. (Tr. 21.)

Officer Sweeney had stopped had Minnesota license plates, they terminated the stop and allowed the driver to drive away.[7] (Tr. 22.)

Later that morning, while collecting evidence at the scene of the shooting, the officers learned that the information about the suspect vehicle having out-of-state license plates was incorrect. (Tr. 22; Hr'g Ex. 2.) In other words, the stop was terminated based on erroneous information. Sometime after that, Officer Sweeney used the National Criminal Information Center and the Minnesota BCA website to attempt to identify the passenger by the name provided at the scene, but there were no persons/drivers in the databases by the name Andre Jones England. (Tr. 28.)

**b. Analysis**

Defendant Dunn argues that the traffic stop on August 30, 2019, was unlawful and without reasonable suspicion. He asserts that Officer Sweeney's dash camera—once it was turned on—shows that the SUV's lights were on. He contends that Officer Sweeney's statement that he stopped the SUV because its lights were "blacked out" is not credible because (1) Officer Sweeney chose to delay turning on the dash camera video for a few blocks rather than turning on the dash camera immediately upon seeing the SUV, (2) the driver of the SUV stated that the SUV's lights come on automatically, and (3) the

---

[7]     The account provided by Officer Sweeney at the hearing about the August 30, 2019 stop is consistent with the video taken from Officer Sweeney's body-worn camera. (*See* Hr'g Exs. 1, 2.) Officer Sweeney testified that similar to squad video, the body-worn camera is consistently recording in 30-second blocks, and when he activates the camera by double tapping a button on the camera it automatically saves the 30 seconds prior to activation, with no audio, and then continues to record and save video at that point, with audio. (Tr. 23.)

officers did not charge the driver for a traffic violation related to the lights being out. Defendant Dunn requests that the fruits of any evidence gained from this stop—namely, his statement giving the officers a false name—be suppressed. (Doc. No. 71, Dunn's Mem. in Supp. 18–20.)

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "'A traffic stop constitutes a seizure under the Fourth Amendment,' and must be supported by either probable cause or an articulable suspicion that a violation of law has occurred." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007)). Probable cause exists when "the facts available [to an officer] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quotations omitted) (second alteration in original). Courts "routinely look to the collective knowledge of all officers involved in an investigation to determine whether probable cause exists provided there is some degree of communication among the relevant officers." *United States v. Poe*, 462 F.3d 997, 1001 (8th Cir. 2006). In addition, a police officer has probable cause to conduct a traffic stop when "an officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013) (quotations omitted); *see also United States v. Williams*, 429 F.3d 767, 771 (8th Cir. 2005) (stating that any traffic violation provides sufficient probable cause for a traffic stop); *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003) (stating that when an officer sees a violation of a traffic law,

even a minor one, he has probable cause to stop the vehicle). And an officer who observes a minor traffic violation can stop the vehicle even if the stop is a pretext for another investigation. *See, e.g.*, *United States v. Coney*, 456 F.3d 850, 855–56 (8th Cir. 2006); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that an officer's subjective intentions for conducting a traffic stop "play no role in ordinary, probable-cause Fourth Amendment analysis").

Here, probable cause existed to conduct a traffic stop because Officer Sweeney saw the driver of the SUV violate a traffic law by traveling without its lights on. *See United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) ("Any traffic violation, however minor, provides probable cause for a traffic stop." (quotations omitted)). The Court finds Officer Sweeney's testimony to this effect credible.

Moreover, even without the traffic violation, the officers had a reasonable articulable suspicion that the dark SUV—which was traveling away from the area of a shooting in the early morning hours on August 30, 2019—contained evidence of a crime because it matched the description of a vehicle suspected in the shooting that just took place nearby minutes before. Reasonable suspicion exists when an officer has a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). When a traffic stop is based on a radio dispatch, factors including "the temporal and geographic proximity of the car to the scene of the crime, [a] matching description of the vehicle, and the time of the stop" are highly relevant to a finding of reasonable suspicion. *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (holding reasonable suspicion existed for a *Terry* stop two

blocks away from the reported crime and five to seven minutes after dispatch identified a gray vehicle engaging in criminal activity in the early morning hours); *see also United States v. Daniel*, 887 F.3d 350, 355 (8th Cir. 2018) (finding reasonable suspicion existed to pull over a vehicle when the stop occurred within minutes of the dispatch of the car's description and it occurred late at night with little traffic on the roadway); *United States v. Roberts*, 787 F.3d 1204, 1209–10 (8th Cir. 2015) (finding it reasonable for an officer to stop a car about seven blocks from the scene of a shooting when the car matched the description of a car witnesses observed fleeing the scene).

Officer Sweeney testified that around 2:00-3:00 a.m. he heard a shots-fired call on the radio wherein the dispatcher stated that several shots were fired in the area of Dayton Avenue and that a dark-colored SUV had been seen leaving the area southbound on Milton Avenue. (Tr. 13–15.) Officer Sweeney was nearby and responded to the area. Within minutes, he saw a dark-colored SUV without its headlights on drive past him northbound on Griggs Avenue at a high rate of speed, which was approximately six blocks from the area of the shooting on Dayton Avenue. (Tr. 15–16, 21.) Officer Sweeney described the traffic on the road at that hour as "[v]ery light, not a whole lot of cars on the road . . . ." (Tr. 14.) Under these circumstances, all of the factors listed above are met (i.e., temporal and geographic proximity, matching description, time of the stop) and support a finding of reasonable suspicion. Therefore, the traffic stop that occurred on August 30, 2019, was lawful and Defendant Dunn's motion to suppress evidence based on this stop should be denied.

## II.    August 31, 2019 Stop

### a.  Background[8]

Officer Sweeney testified that the BP gas station on University Avenue was "a known problem property" in his district, meaning that it was a known area for multiple arrests "for anything from stolen vehicles, possession, drug arrests, weapons arrests[,]" and that "at least one homicide" occurred at that address. (Tr. 30.) Because of this, Officer Sweeney frequently patrols this particular BP gas station when he is on duty. (Tr. 30.)

On August 31, 2019, at approximately 4:50 a.m., during Officer Sweeney's shift, he patrolled the University Avenue BP parking lot in his marked squad car. (Tr. 29–31, 36.) As he entered the parking lot on the north side of the convenience store, he observed a silver Chevy Malibu double-parked and not completely pulled into the parking spot.[9] (Tr. 31.) There were several people walking through the parking lot at the time. (Tr. 32.) Officer Sweeney testified that as he slowly proceeded in front of where the Malibu was parked, he made comments and hand gestures toward the driver of the Malibu that would indicate he should move his vehicle back. (Tr. 32, 38.) Officer Sweeney also testified that when he glanced at the driver, he also observed the passenger and believed it to be the

---

[8]    The following background summary is taken from Officer Dustin Sweeney's testimony as well as from his body-worn camera video from August 31, 2019. (*See generally* Doc. No. 69, Tr.; *see also* Doc. No. 61, Hr'g Ex. 3.)

[9]    Officer Sweeney testified that being double-parked in a private lot is not a crime. (Tr. 53.)

passenger from the SUV that Officer Sweeney had stopped the day before – the person who identified himself as Andre Jones England (i.e., Defendant Dunn). (Tr. 32, 38.) At this point, Officer Sweeney stopped his vehicle (which was now perpendicular to the Malibu and positioned a few feet in front of it),[10] activated his body-worn camera,[11] and notified dispatch that he was going to be on an investigative stop[12] at the BP. (Tr. 32.) He did not turn his squad car lights or sirens on at the time he stopped his car, and he did not shine a spotlight on the Malibu. (Tr. 35–36.) Officer Sweeney testified that he wanted to speak with the passenger and attempt to get correct identification since he believed that he had provided false identification the night before. (Tr. 38.) Officer Sweeney also testified that he would not consider the occupants of the Malibu free to leave. (Tr. 56.)

Officer Sweeney's body-worn camera video shows that he exited his squad car, walked directly to the driver's side window, and had the following conversation with the passenger, Defendant Dunn:

Q [Officer Sweeney].  Hey, man.

A.  Hey, man.

---

[10]    Both Officer Sweeney's body-worn camera video (Hr'g Ex. 3) and a still shot from another squad car (Hr'g Ex. 5) show that Officer Sweeney's squad car was positioned a few feet from the front of the Malibu. Officer Sweeney testified that the driver of the Malibu would have been able to maneuver around his squad car. (Tr. 36.)

[11]    The prior 30 seconds were therefore recorded without audio. During those prior 30 seconds, the camera was facing the steering wheel and was not facing the Malibu. (Hr'g Ex. 3, T09:50:22Z–T09:50:52Z.)

[12]    Officer Sweeney testified that if he were making a regular traffic stop, he would have said "119 traffic" and then would have given his location. (Tr. 40.) Instead, he said he would "be on an investigate at BP" because he was going to be making contact with citizens. (Tr. 40.)

Q.  What's your real name?

A.  What?

Q.  What's your real name?

A.  Andre.

Q.  Andre what?

A.  Huh?

Q.  We were talking yesterday, I don't think I got your right name.

A.  Andre England.

Q.  Andre England? How you spell it, man?

A.  [inaudible].

Q.  Yeah.

A.  [inaudible] L-A-N-D.

Q.  L-A – L what?

A. L-A-N-D.

Q. L-A-N-D?  What's your date of birth?

A. [inaudible].

Q.  You got an ID in Minnesota?

A.  [inaudible].

Q.   You ain't got an ID at all? Not one ID? Sorry, man, I hate to just jump over here like this. But, we were having a conversation yesterday and I just want to make sure he gave me the real name. So, that's -- that's -- where you got an ID out of, what state?

A. [inaudible].

Q. In Minnesota? So if I go on my fancy little computer over there I'm gonna pull something up? That's weird cause I tried that yesterday. February 5th, 1991, right? That's weird. Cause I looked it up and I didn't find a damn thing. You wouldn't wanna give a --false information to a police officer, you know that right?

A. [inaudible].

(Hr'g Ex. 3, T09:50:53Z–T09:52:08Z; Tr. 67.)[13] Officer Sweeney did not converse with the driver right away, but was solely focused on the passenger. (Tr. 67.)

Officer Sweeney then walked over to the passenger side of the car while requesting another squad car to the scene. (Hr'g Ex. 3, T09:52:10Z–T09:52:22Z.) Officer Sweeney testified that he moved to the passenger side because when speaking with the passenger he started to stare straight forward and seemed nervous, which in Officer Sweeney's experience these are actions indicating that the person is potentially going to attempt to flee. (Tr. 41.) The passenger-side window was partially open at that time. He asked the passenger to step out of the car. (*Id.* at T09:52:22Z–T09:52:23Z.) The passenger-side window proceeded to close. (*Id.* at T09:52:25Z–T09:52:27Z.) Officer Sweeney then said, "Step out of the car" multiple times, and knocked on the car. (*Id.* at T09:52:27Z–T09:52:36Z.)

At that point, some people who were on foot in the parking lot started to approach Officer Sweeney trying to get his attention, getting within a couple of feet of him. (*Id.* at

---

[13]    When asked at the hearing whether he was investigating Defendant Dunn for giving a false name, Officer Sweeney said, "Initially that's correct, yes." (Tr. 60.) Officer Sweeney also confirmed that when he asked "What's your real name?" he was collecting evidence that could be used against him to show that he violated the law relating to proving false information to a police officer. (Tr. 80.)

T09:52:37Z–T09:52:49Z.) Officer Sweeney then asked dispatch to speed the second squad car up, and as he moved back over to the driver's side of the car he demanded that the driver of the Malibu put the car in park and put his hands where he could see them. (*Id.* at T09:52:50Z–T09:53:00Z.) At this time, Officer Sweeney's service pistol was drawn; he testified that he believed there was a real possibility that the passenger was in possession of a firearm based on the previous night's stop involving that same passenger and his belief that the SUV that was stopped the previous night was very likely the vehicle involved in the shots-fired call that he responded to. (Tr. 33–34.) Officer Sweeney asked the driver whether he was going to start driving off, and the driver responded that he was trying to park the car.[14] (Hr'g Ex. 3, T09:53:07Z–T09:53:10Z.) Officer Sweeney testified that during this part of the stop he was not able to maintain visual contact with the individuals' hands in the car consistently, and he believed there was a potential that they might have been reaching for some sort of weapon. (Tr. 42.) By this time, the second squad car arrived on scene. Officer Sweeney moved back over to the passenger side and ordered the passenger out of the car. (Hr'g Ex. 3, T09:53:19Z–T09:53:25Z; Tr. 42–43.) As the passenger exited the vehicle, a gun dropped to the floorboard of the passenger side of the car.[15] (Hr'g Ex. 3, T09:53:39Z–T09:53:46Z;

---

[14]     Officer Sweeney testified that when he was moving back around to the driver's side of the vehicle, he thought the driver was trying to drive the vehicle away. (Tr. 42.) The video from his body-worn camera does not show that the car was moving forward. Even if it did, however, it is equally likely that the car may have rolled forward slightly when the driver placed the car in park and took his foot off the brake.

[15]     The gun was later identified as stolen. (Tr. 43.)

Tr. 43; *see* Hr'g Ex. 7.) The driver and the passenger were then handcuffed and placed in the back of separate squad cars. (*Id.* at T09:55:08Z–T09:55:38Z, T09:56:38Z–T09:56:44Z; Tr. 34–35.)

A few minutes later, Officer Sweeney described what had transpired to his supervising officer:

> I recognize the passenger as the guy that I was working on IDing last night . . . from that shots fired . . . so I was like alright, cool, I jump out. I come over on the driver's side. At first they were parked all the way out here. And so, I was like hey man where do you learn to park? Just kind of giving them shit. Then I look over at the passenger and I'm like oh, okay, that's my guy from yesterday . . . .

(*Id.* at T09:57:04Z–T09:58:31Z.) After talking with his supervising officer, Officer Sweeney went back to his squad car to try to get an ID on the passenger. (*Id.* at T10:01:22Z–T10:01:28Z.) He asked the passenger again what his real name was.[16] (*Id.* at T10:01:42Z–T10:01:43Z.) The passenger responded with the name Darnell Andre Dunn and his date of birth. (*Id.* at T10:01:46Z–T10:02:21Z.) The driver of the Malibu was confirmed to be Defendant Lindsey. (Tr. 33.)

### b.  Analysis

Defendants Dunn and Lindsey argue that Officer Sweeney conducted an investigatory detention in the BP parking lot on August 31, 2019, without reasonable articulable suspicion or probable cause. Defendant Lindsey also argues that there was no probable cause for his arrest, and Defendant Dunn argues that any statements that he

---

[16]    At the hearing, Officer Sweeney confirmed that after the passenger had been placed in the squad car, he was still investigating him for giving a false name. (Tr. 60.)

made to law enforcement on August 31, 2019, should be suppressed because the questioning violated his Constitutional rights.

### (i)  Investigatory Detention

Defendants' Constitutional challenge to the August 31, 2019 stop raises two issues. First, whether Officer Sweeney's initial contact with the Defendants was a stop within the meaning of the fourth amendment. And second, if it was, whether the stop was supported by reasonable suspicion. This Court concludes that Officer Sweeney's first encounter—when he pulled his squad car in front of the vehicle that Defendants were in and parked in front of it—was a seizure within the meaning of the fourth amendment. This Court also concludes, however, that the stop and seizure was made with reasonable suspicion.

Not every encounter between the police and the public is eligible for fourth amendment protection. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). In this case, the Government argues the initial encounter constituted a consensual encounter; the Defendants argue the initial encounter was an investigative stop and a fourth amendment seizure.

> The characterization [of the initial encounter] is crucial because a voluntary encounter intrudes on no constitutionally protected interest and therefore receives no fourth amendment protection. In contrast, a temporary detention for investigative purposes, or *Terry* stop, requires that the police officer have founded suspicion: reasonable suspicion based on articulable facts of some criminal activity afoot.

*United States v. Kerr*, 817 F.2d 1384, 1386 (9th Cir. 1987).

The Government asserts that because there was enough room for the Defendants to maneuver their vehicle past the squad car, the Defendants were not detained when he parked his squad car in front of their vehicle. This Court disagrees. Officer Sweeney arrived on the scene in uniform and in a marked patrol car. Acting in his official capacity, he parked his squad car perpendicular to the silver Malibu, within a few feet of the front of the Malibu, and within the lane of traffic one would need to use to exit the parking lot. Officer Sweeney testified that once he parked the squad car, he radioed in to dispatch stating that he was going to do an investigative stop, and that he believed the Defendants were not free to leave. Under these circumstances, Officer Sweeney's authority and conduct provided the Defendants with no reasonable alternative except to stop and have an encounter with the police. Therefore, the encounter was not voluntary and it was a seizure under the fourth amendment. *See Kerr*, 817 F.2d at 1386–87 (concluding that an encounter whereby the officer blocked the defendant was not voluntary, stating "[t]he district court's suggestion that Kerr could have backed around the car or ignored Deputy Hedrick defies common sense; Kerr's freedom to depart was restrained at the moment Deputy Hedrick blocked the one-lane driveway").[17]

---

[17]    *But see United States v. Pajari*, 715 F.2d 1378, 1380–81 (8th Cir. 1983) (concluding there was no "seizure" or "stop" when parking behind the defendant's vehicle, but there was when the officers ordered defendant to raise his hands and leave his car). This Court notes that even if the initial moments when Officer Sweeney parked his squad car in front of the Malibu and approached the vehicle were not a forcible stop, this Court views the entire investigative stop legitimately justified and supported with reasonable, articulable suspicion.

Next, the Court must consider whether the fourth amendment stop was supported by reasonable suspicion. "A law enforcement officer may detain a person for investigation without probable cause to arrest if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Green*, 691 F.3d 960, 963 (8th Cir. 2012) (quotations omitted). This standard is "less demanding than that for probable cause . . ." *United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993). To establish reasonable suspicion to support a temporary detention, the police officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "Reasonable suspicion is not a finely-tuned or bright-line standard; each case involving a determination of reasonable suspicion must be decided on its own facts." *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (quotations omitted).

Officer Sweeney testified that as he was slowly patrolling the BP parking lot (which was known to be a high-crime location) at approximately 4:50 a.m. and approaching the silver Malibu, he saw the person in the passenger front seat and recognized him from the night before. Specifically, he recognized him as the passenger from the SUV that was observed leaving the area of a shooting and who identified himself as Andre England.[18] Officer Sweeney had reason to believe that the passenger provided him with a false name the night before because he searched law enforcement databases for the name Andre England and there were no hits.

---

[18]    See above for the reasoning supporting reasonable suspicion for the August 30, 2019 stop of the SUV.

Defendants dispute that Officer Sweeney saw Defendant Dunn as he was pulling up, claiming that it would have been hard to see the passenger with the windows tinted and with the sun visor down, and also claiming that the version of events that Officer Sweeney recounted to his supervisor indicated that he observed Defendant Dunn only after he reached the driver's side window. This Court, however, finds Officer Sweeney's testimony about when he first observed Defendant Dunn as the passenger credible, especially considering the video evidence of the actions he took immediately upon parking his squad car. First, he notified dispatch that he was going to be on an "investigative" stop. Then, without hesitation, Officer Sweeney stepped out of the squad car, walked to the driver's side of the Malibu, and started talking directly to the passenger (not the driver), asking him questions about what his real name was and referencing the traffic stop from the night before. Common sense dictates that Officer Sweeney would have proceeded in such fashion only if he had observed that it was Defendant Dunn in the passenger seat prior to him stepping out of the squad car.

Defendants also argue that Officer Sweeney's description of the events to his supervisor supports their contention that Officer Sweeney did not notice the passenger was Defendant Dunn until he was standing beside the driver's door. This Court disagrees. It is apparent from Officer Sweeney's body-worn camera video that Officer Sweeney was providing a quick recount, not necessarily in chronological order. This Court believes Officer Sweeney's testimony that he saw Defendant Dunn as he was patrolling the BP parking lot and coming to a stop in front of the Malibu was credible. Officer Sweeney suspected Defendant Dunn of two crimes – involvement in the prior night's shooting and

proving false information to police. Considering the totality of the circumstances, this Court concludes Officer Sweeney did have reasonable articulable suspicion that Defendant Dunn had been involved in criminal activity, and therefore the *Terry* stop was proper. Accordingly, the evidence that resulted from the subsequent search—including the firearm that fell to the floorboard—should not be suppressed as fruit of the poisonous tree.

### (ii) Probable Cause to Arrest Defendant Lindsey

Defendant Lindsey argues there was no probable cause to arrest him because there was no probable cause that he had actual or constructive possession over the firearm. "Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it." *United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).

This Court concludes that the fact issue of whether Defendant Lindsey had actual or constructive possession of the firearm found in the Malibu (and whether Defendant Lindsey had the requisite knowledge) is an issue for trial and is separate from the issue of whether the officers had probable cause to arrest Defendant Lindsey at the scene. At the time of Defendant Lindsey's arrest, the officers knew Lindsey had been in the driver's seat of the vehicle, in the immediate vicinity of the firearm. The firearm was potentially available and accessible to Defendant Lindsey even though it appeared that Defendant Dunn had been sitting on it, and the firearm was determined to be stolen. Thus, the

19

officers had probable cause to conclude that Defendant Lindsey was in constructive possession of the firearm found in his immediate vicinity and was involved in a crime. *See Branch v. Gorman*, 742 F.3d 1069, 1072–73 (8th Cir. 2014) (finding probable cause to arrest the passenger when the flask was available and accessible to him). Defendant Lindsey's motion to suppress based on this argument should therefore be denied.[19]

### (iii) Defendant Dunn's August 31, 2019 Statements

Defendant Dunn told Officer Sweeney his name was Andre Jones England during the traffic stop of the SUV on August 30, 2019. After that traffic stop, Officer Sweeney could not find record of that name anywhere in the law enforcement databases he searched. Therefore, Officer Sweeney believed the information Defendant Dunn had provided regarding his identification was false. On August 31, 2019, when Officer Sweeney approached the vehicle he believed Defendant Dunn to be a passenger in, the first thing Officer Sweeney did was ask Defendant Dunn, "Hey, man. What's your real name?" (Hr'g Ex. 3, T09:50:53Z–T09:52:08Z.) Defendant Dunn argues that this, as well as the questions that followed, and the question about Defendant Dunn's name while he was sitting in the squad car, were custodial interrogation by Officer Sweeney that violated his rights because they were not preceded by advice of rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

Routine biographical data is exempted from *Miranda*'s coverage. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *see also United States v. McLaughlin*, 777 F.2d 388,

---

[19]    Because Defendant Lindsey's argument as to probable cause fails, his fruit-of-the-poisonous-tree argument also fails.

391 (8th Cir. 1985) ("[A] request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating."). However, "if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, [then the] questioning [will] be subject to scrutiny." *McLaughlin*, 777 F.2d at 391–92; *see Muniz*, 496 U.S. at 602 n.14 (stating that during booking procedures, a government agent may not ask questions "that are designed to elicit incriminatory admissions") (quotations omitted).

Here, Officer Sweeney admitted at the hearing that he was investigating Defendant Dunn on August 31, 2019, for giving a false name. (Tr. 60.) Officer Sweeney also confirmed that when he asked "What's your real name?" he was collecting evidence that could be used against him to show that he violated the law relating to proving false information to a police officer.[20] (Tr. 80.) Defendant Dunn's name was therefore directly relevant to the substantive offense being investigated, and Officer Sweeney's questions regarding Defendant Dunn's name were investigative in nature. Therefore, Officer Sweeney's questions fell outside the routine booking question exception, and Defendant Dunn's motion to suppress his statements should be granted.[21]

---

[20]    Ultimately, the government did not charge Defendant Dunn with providing a false statement.

[21]    Although Defendant Dunn does not make the argument, any argument that other evidence seized from the scene should be suppressed as fruit of the poisonous tree would fail because the other evidence would have been inevitably discovered. "The inevitable discovery doctrine provides an exception to the exclusionary rule where 'the prosecution
(Footnote Continued on Next Page)

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant Dunn's Motion for Suppression of Evidence (Doc. No. 55) be

**GRANTED IN PART** and **DENIED IN PART**; and

---

can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

"To decide whether there is a reasonable, articulable suspicion that a suspect is armed and presently dangerous, we consider the totality of circumstances known to the officer at the time of the search." *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (stating that the determination of whether reasonable suspicion existed to justify a *Terry* weapon frisk is based on the totality of the circumstances). The totality of the circumstances include the suspect's location, a history of crime in the area, the suspect's nervous behavior and evasiveness, and the officer's "commonsense judgments and inferences about human behavior." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)). In addition, the Supreme Court has recognized that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." *Maryland v. Wilson*, 519 U.S. 408, 414 (1997); *see also United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (finding reasonable, articulable suspicion because officer was outnumbered by vehicle's occupants, officer recognized one passenger as drug trafficker found to be carrying a weapon, and stop occurred late at night on deserted road); *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991) (stating officer had reasonable suspicion sufficient to search driver during routine traffic stop because officer recognized driver as drug trafficker and knew drug traffickers often carried weapons).

Here, it was reasonable for Officer Sweeney to ask Defendant Dunn to step out of the vehicle—regardless of the answers provided by Defendant Dunn to Officer Sweeney's questions—because of his suspicion of criminal activity and his fear for his own safety based on Defendant Dunn's nervous behavior, his location, the history of crime in the area, and the context of the identification from the night before. The gun thus would have been inevitably discovered regardless of the questioning.

      2.      Defendant Lindsey's Motion to Suppress Search and Seizure Evidence

(Doc. No. 56) be **DENIED**.


Date:  February 28, 2020           *s/ Becky R. Thorson*
                                        BECKY R. THORSON
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **March 13, 2020**. A party may respond to those objections by **March 27, 2020**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.